## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **CRIMINAL NO. 22-CR-275 (CKK)** |
| | : | |
| PHILIP DUPREE, | : | |
| | : | |
| (aka "PHILLIP DUPREE), | : | |
| Defendant. | : | |

## UNITED STATES' TRIAL BRIEF

The defendant, Philip Dupree, a former police officer with the Fairmount Heights, Maryland, Police Department (FHPD), was charged by indictment with one count of 18 U.S.C. § 242 (deprivation of rights under color of law) and one count of 18 U.S.C. § 1512(b)(3) (obstruction of justice).  ECF No. 1.  At the time of the charged offenses, the defendant was working and on duty as a police officer.  During the course of a traffic stop in the District of Columbia, the defendant pepper-sprayed Torrence Sinclair ("Sinclair").  As set forth in the indictment, the defendant's use of pepper spray constituted a willful deprivation of Sinclair's constitutional right to be free from a police officer's use of excessive force.  In the aftermath of the pepper-spray incident, the defendant obstructed justice by misleading a Maryland state commissioner through the submission of a falsified statement of charges ("statement of probable cause" or "PC statement") to cover up the defendant's use of excessive force.

Trial is set to begin June 3, 2024.  In order to minimize the number of issues that may arise during trial and prevent unnecessary delay, the United States respectfully submits this trial brief to (1) provide the Court with relevant factual background and outline the government's anticipated

presentation of evidence; and (2) identify and address certain evidentiary issues that may arise in the course of the trial.

## I.       The charged conduct.

### A.   *The Defendant's Use of Pepper Spray without Justification*

During the early morning hours on August 4, 2019, the defendant was working as an FHPD police officer.   Although the defendant was on-duty, he was driving his unmarked, personal vehicle that was equipped with police emergency equipment.   While on patrol, the defendant purportedly observed Sinclair speeding.   As a result, the defendant activated his emergency equipment and stopped Sinclair.   The traffic stop took place on Eastern Avenue NE, in the District of Columbia, just across the Maryland-District of Columbia border.   Sinclair and his sister, Taylor Sinclair ("Taylor"), were returning home to the District of Columbia from a family cookout in Maryland.

From the beginning of the traffic stop, the defendant failed to follow proper police procedures.   He failed to activate his body-worn camera (BWC).   As a result, there is no documentation of the initial encounter between the defendant and Sinclair beyond a 911 recorded call that Taylor placed at the time of the stop complaining about the defendant's aggressive behavior.   Based on the 911 recording, the defendant told Sinclair to put his hands behind his back or he would pepper spray Sinclair, and the defendant would activate his BWC to make the stop "official."   GX 201 (911 Recording).   Sinclair questioned the stop because he had not committed any traffic violations and because the stop occurred in the District of Columbia.   The defendant asked Sinclair to exit his vehicle, handcuffed Sinclair behind his back, and placed him in the front passenger seat of the defendant's personal vehicle.

After the defendant radioed for back-up, Corporal Jason Buie (Cpl. Buie) of the Prince George's County Police Department (PGCPD) responded.   Around that same time, MPD Officer Lancelot Francioni (Ofc. Francioni) arrived at the scene in response to Taylor's 911 call.   Unlike the defendant, Ofc. Francioni activated his BWC.   While Sinclair was seated in the defendant's vehicle, Taylor sat in Sinclair's car to prevent the defendant from towing the vehicle.   After the defendant told Taylor that he "was going to ask [her] one more time to get out of the car," Taylor responded that the car belonged to her brother and that she had a [driver's] license.   GX 101 (Francioni BWC).   When Taylor still refused to exit the vehicle, the defendant threatened to pepper spray her by aggressively shaking his canister of pepper spray:



3

As the defendant continued to engage with Taylor, she told him, "You pulled your pepper spray out and threatened me," and that she had "Fifth Amendment rights" and "all types of rights." GX 101.   In response, the defendant jerked Taylor out of the car, put her in handcuffs, and seated her on the curb.   Taylor became agitated and started yelling, "What you doing this for?"   As Ofc. Francioni tried to de-escalate the situation, Taylor explained that when the defendant pulled Sinclair over, the defendant "grabbed his pepper spray . . .   the same way" he had "just grabbed it" with her.   GX 101.

While the defendant was engaged with Taylor, Sinclair was seated in the front passenger seat of the defendant's vehicle with his hands handcuffed behind his back.   Cpl. Buie stood by and kept watch over Sinclair.   Both Cpl. Buie and Ofc. Francioni will explain that while Sinclair was in the car, he was upset and yelling obscenities—including calling the defendant a "f-ggot ass" and "little b[]tch," which is common behavior among individuals being placed under arrest. Although Sinclair activated the emergency lights and sirens while he was restrained and detained in the defendant's car, both law enforcement witnesses will testify that Sinclair did not pose any threat, nor did he attempt to escape from the vehicle as he was seated in it.   As Sinclair continued to activate the emergency equipment, he stated that he would put the car in drive, which prompted Cpl. Buie to ask Sinclair to step out of the vehicle.   Sinclair calmly complied.   The defendant seated Sinclair on the curb next to Taylor.   He also requested assistance from Cpl. Buie and PGCPD with transporting Sinclair and Taylor back to Maryland.   When Cpl. Buie told the defendant that PGCPD would not assist with the transport (because Maryland officers are required to request assistance from MPD with making arrests that occur in the District of Columbia), the defendant became upset and frustrated by the lack of assistance.   He then placed Sinclair back

into the front passenger seat of his vehicle.

Although Sinclair continued to yell and scream obscenities at the defendant, as did Taylor, Sinclair still did not pose any threat or danger to anyone.   In fact, as the defendant shoved Sinclair back into his vehicle, Sinclair danced and joked that he was "shaking his thing," and asked where the defendant was taking him.   GX 101.   Sinclair also demanded that the defendant give him a breathalyzer.   After the defendant placed Sinclair back in the front passenger seat of his vehicle, the defendant stood in the gap between the open car door, inches away from Sinclair.   Sinclair started to scream, pleading to have another officer transport him.   As Cpl. Buie walked by, the defendant stated, "Did you just?"   Even though the BWC footage is dark, what happened next is clear: the defendant grabbed his pepper spray, took a step back away from Sinclair, shook the canister, and then stepped forward toward Sinclair, at which point the defendant pepper-sprayed Sinclair in the face and chest.   Both Cpl. Buie and Ofc. Francioni will testify that the defendant pepper-sprayed Sinclair without justification.   Although Sinclair continued to yell and scream demeaning and emasculating obscenities at the defendant, neither Cpl. Buie nor Ofc. Francioni saw Sinclair do anything that would warrant the use of force against him.

Nor did Isyna Sinclair-Hunter ("Sinclair-Hunter"), the defendant's mother, who observed Sinclair and agreed that he was not threatening or dangerous.   Ms. Sinclair-Hunter arrived on scene several minutes before the defendant sprayed Sinclair, and she began recording with her iPhone.   GX 100, 104.   Immediately before the defendant pepper-sprayed Sinclair, Ms. Sinclair-Hunter exclaimed, "Hey, you better not hit him, You better not spray him for talking sh[]t!"   As soon as the defendant pepper sprayed her son, Ms. Sinclair-Hunter exclaimed, "Oh, he sprayed him for just talking!   And he's handcuffed!   He sprayed him for no reason.   You handcuffed,

5

you are not a threat to him."   GX 100.   As the jury will see, and as the evidence will show, Ms. Sinclair-Hunter was correct: the defendant pepper sprayed her son as punishment for mouthing off.

While Sinclair screamed in pain and yelled at the officers for medical assistance, the scene continued to escalate.   Taylor, Ms. Sinclair-Hunter, and another civilian on scene yelled at the defendant for pepper spraying Sinclair for no reason.   Sinclair also told his mother to call his attorney.   As Sinclair continued to scream that he was unable to breathe, the defendant told Sinclair that he "shouldn't have tried to bite" him.   GX 101.   At no time, however, did the defendant explain to Cpl. Buie or Ofc. Francioni the reason why he had pepper-sprayed Sinclair. Neither of them observed any conduct by Sinclair that would have justified the defendant's use of force.

As the officer in charge on the scene, the defendant was responsible for ensuring that Sinclair was decontaminated following the use of pepper spray.   Cpl. Buie, however, summoned emergency medical services (EMS) to the scene to render aid to Sinclair.   Notwithstanding that Sinclair was screaming for medical attention, EMS did not treat or decontaminate Sinclair.   Nor did the defendant transport him to the hospital or otherwise treat him for pepper spray contamination.   Instead of transporting Sinclair to the county lock-up as required by FHPD policy, the defendant transported Sinclair to the FHPD station and detained him there for several hours before turning him over to the county jail.

## B.  The Defendant's Cover-Up

While at the FHPD station, the defendant continued with his false narrative in order to cover up his misconduct, including the use of excessive force.   Specifically, he drafted and

submitted a falsified "statement of probable cause" (PC Statement) to a Maryland state commissioner (Commissioner) so that the Commissioner would approve local criminal charges against Sinclair.   The defendant's cover-up included lodging numerous false misdemeanor violations against Sinclair in order to justify the defendant's use of force.

In the PC statement, the defendant claimed that while Sinclair was seated in the defendant's car, he "reached around and unlocked the police door and tried to jump out of the car several times."   GX 301 (PC Statement).   This statement was false.   Similarly, the defendant claimed that Sinclair "started to kick and damage things inside" the vehicle.   The defendant further wrote that he "tried to work with [Sinclair] but he kept on trying to fight and bite me[.]," another false statement.   With respect to his use of the pepper spray, the defendant wrote that he had "deployed [his] Department issued (Pepper Spray) which did get [Sinclair] to comply for a short time."   The defendant also claimed that the traffic stop occurred on the Maryland side of the border, and that EMS decontaminated Sinclair following the pepper spray deployment.   Neither statement was true.   Finally, the defendant falsely claimed that he transported Sinclair "without incident" to the county jail in Upper Marlboro from the traffic stop.

The defendant's narrative concerning Sinclair's conduct, and the defendant's justification for the use of pepper spray, is inconsistent with the evidence that will be presented at trial.   Both video footage and eyewitness accounts contradict the false and misleading PC Statement.   The evidence will demonstrate beyond a reasonable doubt that the defendant's use of force was excessive and that he fabricated a narrative to justify his use of force.   Based upon the falsified PC Statement, the Commissioner approved the following charges: disorderly conduct, resisting arrest, and attempted escape from police custody.   The Commissioner did not find probable cause

for a second disorderly conduct charge, assault, and malicious destruction of municipality property.   The charges against Sinclair that were approved by the Commissioner were eventually dismissed by the local prosecutor's office.

   *C.   The Defendant's Training*

   As multiple witnesses will explain, the Maryland Police and Correctional Training Commission (MPCTC) has standardized training for all Mayland state law enforcement officers, and it certifies all police cadets who successfully complete that standardized training at an approved police academy.   This standardized training includes, among other topics, the use of force, defensive tactics, police operations, and criminal law.

   Between 2010 and 2011, the defendant successfully graduated from the police academy hosted by the Ann Arundel County Police Department at the Ann Arundel County Community College.   GX 400.   The courses in the academy were taught by MPCTC certified instructors. While at the academy, the defendant learned about circumstances that justify a police officer's use of force, which included pepper spray training.   GX 403.   The defendant learned that pepper spray may be used against anyone who is an "active resister" or "active aggressor."   Put differently, an officer is justified in using pepper spray against anyone who poses a threat or danger, or to protect against imminent threats of harm, or to overcome physically resisting arrestees.   All Maryland police officers are trained not to use force, which includes pepper spray, against anyone as a form of punishment.   The defendant was also trained, and as required by FHPD policy, to truthfully document and articulate with specificity, all uses of force, including in any police reports with an accompanying use of force report.

### D.  The Defendant's Employment History

Following his graduation from the police academy, the defendant worked at several municipal police departments before joining FHPD.   And, while employed at FHPD, the defendant had worked part-time as a police officer for the Prince George's County Community College Police Department.   The defendant received state mandated annual "in-service" training throughout the time he was employed as a police officer.   As discussed in the government's FRE 404(b) motion (ECF No. 32), the defendant was terminated from the District Heights and Prince George's County Community College police departments.   More specifically, the defendant was terminated from District Heights and Prince George's County Community College police departments for multiple allegations of misconduct, which included the use of excessive force.

At trial, the government expects to introduce Rule 404(b) evidence, if permitted by the Court, which includes evidence of the defendant's termination from the District Heights Police Department.   *See* ECF No. 64, Mem.Op. (admitting Rule 404(b) evidence on a provisionary basis).

### E.  Policy and Procedures Violations Committed by the Defendant

While employed at the District Heights Police Department, and prior to the charged incident, the defendant was terminated for failing to follow his training, and departmental policy and procedures violations.   The Court has found that the termination evidence is relevant and offered for a permissible purpose; and the Court will assess at trial whether the evidence is admissible.   *See* ECF Nos. 63, 64.   Beyond his police academy training, the defendant's prior termination informed him about the prohibited use of excessive force prior to the incidents charged in the indictment.   Accordingly, the prior termination is relevant evidence because it is probative

of the defendant's state of mind, or intent, in committing the charged offenses.   Moreover, with respect to the charged conduct, the defendant violated several FHPD policies concerning arrests outside of the municipality, the use of force, and report writing.   This policy violation evidence is also relevant to the defendant's state of mind in committing the charged offenses.

## II.      The Government's Evidentiary Presentation

At trial, the government intends to call eyewitnesses, and present video and documentary evidence, that will prove the defendant's crimes.   Witnesses will include civilian and law enforcement eyewitnesses who will describe the defendant's actions on August 4, 2019; videos obtained from one law enforcement witness's BWC and Sinclair-Hunter's cell phone camera; a use of force expert witness to opine on the defendant's conduct; and, potentially, evidence of prior incidents to prove the defendant's intent, knowledge, lack of accident, or absence of mistake.   To prevent in-trial delay from objections that can be resolved before trial, the government addresses the evidence it anticipates introducing in its case-in-chief.

### a.  Documentary and Video Evidence

As indicated above, the government intends to introduce video evidence obtained from MPD BWC and an eyewitness's cell phone camera of the defendant's traffic stop and excessive use of force.   Taken together, those videos show that Sinclair was physically compliant throughout the incident, and that he never posed any threat or was physically aggressive, despite being irate, loud, and angry.   In addition to capturing the incident, the videos also capture admissible statements, as discussed further below, and demonstrates that the defendant's PC Statement contains materially false and misleading information.   The government also intends to introduce documents (including the PC Statement) further demonstrating the defendant's

10

misconduct in obstructing justice.   Both the video evidence and the defendant's PC Statement, together with witness testimony, will prove that the defendant willfully violated Sinclair's rights by using force that he knew was excessive and that he subsequently engaged in misleading conduct towards a Maryland state commissioner to cover up his misconduct.

The admissibility of evidence involves three questions: first, whether the evidence is relevant; second, whether the evidence is authentic—*i.e.*, whether it is what it purports to be; and third, whether the evidence contains any inadmissible hearsay.   The relevance of this evidence, broadly speaking, is explained in the description of the defendant's use of excessive force and cover-up scheme in Part I above.   Below, we explain how the government intends to authenticate the evidence and why statements contained in the evidence are admissible as non-hearsay or exceptions to hearsay.[1]

### i. Authentication

To authenticate evidence, such as video, or other records, the proponent "must produce evidence sufficient to support a finding [by the jury] that the item is what the proponent claims it is." Fed. R. 901(a). The threshold for authenticity is "not high" and the proponent's burden is "slight"; the proponent is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Hassanshahi*, 195 F. Supp.3d 35, 48 (D.D.C. 2016) (citations and quotation marks omitted); *see also United States v. Safavian*, 435 F. Supp.2d 36, 39 (D.D.C. 2006) ("[T]he Court need not find

---

[1] In response to the government's request that the defense stipulate to the authenticity of the government's exhibits at trial, the defense sent a list of approximately 10 exhibits to which the defense was willing to stipulate.   As to the remaining exhibits, regardless of whether the government and the defendant can come to an agreement on the authenticity of the evidence in advance of trial, the government maintains this evidence is both authentic and admissible.

that the emails are necessarily what the proponent claims, only that there is evidence sufficient for the jury to make such a finding.") (citation omitted).

Authenticity can be established through testimony from a witness with knowledge that "an item is what it is claimed to be," Fed. R. Evid. 901(b)(1), by examining the item's "appearance, contents, substance, internal patterns, or other distinctive characteristics [ ], taken together with all the circumstances," Fed. R. Evid. 901(b)(4), and other methods.   Absent evidence of alterations or specific indicia that a document is not what it purports to be, arguments about its reliability or trustworthiness are "more appropriately directed to the weight the jury should give the evidence," not to whether it should be admitted. *Id.* at 40; *see also Hassanshahi*, 195 F. Supp. 3d at 48 ("The ultimate resolution of the evidence's authenticity is reserved for the jury.").

The majority of the evidence the government intends to offer at trial was obtained through grand jury subpoenas and voluntary disclosures.   Such evidence is readily authenticated through testimony by a law enforcement agent with knowledge of the collection process.   *See Braswell v. United States*, 487 U.S. 99, 119 (1988) (explaining that the government may authenticate records through testimony "establishing that the corporation produced the records subpoenaed" and the "jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena").

Furthermore, although the video evidence the government intends to offer at trial could also be authenticated by a law enforcement agent with knowledge of how this evidence was obtained, the government further intends to authenticate its video and photograph evidence through the testimony of those familiar with the actions captured in the video and depicted in the

photographs. *See United States v. Rembert*, 863 F.2d 1023, 1026-27 (finding photographs can be authenticated through witness testimony and through the contents of the photograph itself); *see also United States v. Strothers*, 77 F.3d 1389, 1393 (D.C. Cir. 1996) ("Tapes may be authenticated 'by testimony describing the process or system that created the tape' or 'by testimony from parties to the conversation affirming that the tapes contained an accurate record of what was said.'") (*citing United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993)).

In addition, virtually all the records the government will introduce at trial were produced to the government, and then to the defense, with an accompanying certification under Federal Rule of Evidence (FRE) 902(2), (4), or (11), which also render the records self-authenticating.

### ii.   Admissibility—Business Records

The government intends to introduce a variety of business records, such as the defendant's training records, employment records, and police department policies and procedures.  Rule 803(6) excepts from hearsay "[r]ecords of a [r]egularly [c]onducted activity," such as "[a] record of an act[ or] event," if the record: "(A) was made at or near the time by—or from information transmitted by—someone with knowledge; (B) . . . was kept in the course of a regularly conducted activity of a business . . .; [and] (C) making the record was a regular practice of that activity . . . ." A business record is admissible without testimony from a custodian upon "a certification that complies with Rule 902(11)," Fed. R. Evid. 803(6)(D), and if "the record and certification [are made] available for inspection—so that the [opponent] has a fair opportunity to challenge them." Fed. R. Evid. 902(11); *see Melendez-Diaz v. Mass.*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an

entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.").   The categories of records listed above fall squarely within Rule 803(6)'s confines.

### iii.   Admissibility- Text Messages

The government intends to introduce a text message (with a photo attached) that the defendant sent to the late FHPD Lieutenant Earl Ivey (deceased) (Lt. Ivey) about Sinclair's arrest. This communication, which the government obtained from a consensual search of Lt. Ivey's mobile phone, shows the defendant committing an FHPD policy violation by detaining Sinclair at the FHPD station rather than transporting Sinclair to the county jail.   While Sinclair was detained at FHPD, the defendant drafted the falsified PC statement where he claimed, among other things, that Sinclair was transported from the scene of his arrest directly to county jail.   The text message is offered to prove that the defendant acted willfully in committing the excessive force incident charged in Count One, and intentionally obstructed justice as charged in Count Two.   The text message is an admissible statement under FRE 801(d)(2)(A).

### iv.   Admissible Hearsay Statements Contained on Video and Audio Exhibits

As noted above, with respect to the August 4, 2019, incident, the government expects to admit at least three videos and one audio recording: (1) GX 100, 104, the iPhone videos filmed by Ms. Sinclair-Hunter; (2) GX 101, the BWC footage from Ofc. Francioni; and (3) GX 201, the 911 call made by Taylor.[2]   These video and audio exhibits contain multiple statements made by Sinclair, Taylor, and Ms. Sinclair-Hunter, as well as statements made by the defendant and other officers on-scene.   Each of the statements are admissible under one (or more) of the exceptions to

---

[2] Relatedly, the government anticipates seeking to admit an exhibit that contains the BWC footage and one of the iPhone videos synched side by side (GX 103).

the hearsay rules under FRE 803(1), (2), (3), and for the non-hearsay purpose to show its effect on the listener.   Due to the volume of the statements, the government sets forth certain illustrative examples below and addresses the evidentiary basis for their admission.  *See United States v. Lovato*, 950 F.3d 1337, 1342 (10th Cir. 2020) ("No authority creates a blanket requirement that a court must individually analyze each statement within a broader narrative under the present sense impression exception.").

On GX 101, the BWC from Ofc. Francioni, as well as GX 201, the 911 call, Taylor makes several statements that are present-sense impressions, excited utterances, or statements of her then-existing state of mind.  *See* FRE 803 (1), (2), & (3).   For example, on the 911 call (GX 201), Taylor explained to the dispatcher that the defendant had threatened to pepper spray Sinclair if he refused to put his "hands behind his back."   Likewise, on GX 101, Taylor stated that the defendant had "pulled out [his] pepper spray and threatened" her and "slammed [her] down like a criminal." She told Ofc. Francioni that the defendant had threatened the use of pepper spray against her brother "the same way" he had just done to her.   She also told the defendant that her brother "ain't try to bite you" and that she "was sitting right here watching."   Similarly, on GX 100, Ms. Sinclair-Hunter told the defendant that he "better not touch him" and that she knew the defendant "wanted to."   As soon as the defendant pepper sprayed Sinclair, Ms. Sinclair-Hunter yelled out that the defendant "sprayed [her son] for talking s[]it."   She also repeatedly stated that Sinclair "didn't try to bite him."   And, Sinclair made several statements on the videos, as well, including that the defendant had "stopped him in D.C."   With respect to the pepper spray, Sinclair repeatedly stated that he could not breathe.   And at one point, Sinclair stated that the defendant had "tried to pepper spray [him] again."

These statements, and others like them from the video and audio exhibits, are admissible as exceptions to the hearsay rule pursuant to FRE 803 (1), (2), and (3), and as non-hearsay to show its effect on the listener. *See, e.g., United States v. Alexander*, 331 F.3d 116, 124 (D.C. Cir. 2003) (admitting 911 calls as excited utterances); *Flythe v. District of Columbia*, 4 F.Supp.3d 222, 233-34 (D.D.C. 2014) (admitting, in a Section 1983 case, a police "radio run call" as present sense impressions and excited utterances); *United States v. Morrow*, 2005 WL 3163803, at *3 (D.D.C. Jun. 9 2005) ("courts across a multitude of jurisdictions . . . have collectively concurred that audio tapes and written logs of 911 calls, telephone calls, and police dispatches are admissible under the present sense impression and excited utterance exceptions to the hearsay rule"); *United States v. Sutton*, 636 F.Supp.3d 179, 199 (D.D.C. 2022) (admitting a police officer's body worn camera footage under Rule 403); *Jones v. United States*, 934 F.Supp.2d 284, 290 (D.D.C. 2013) (statements that were offered "to establish that certain statements were made and their effect on the listener" were offered for a non-hearsay purpose).

The government is providing these exhibits along with this trial brief so that the Court will have ample time in advance of trial to review the video and audio files to assure itself that it agrees the statements contained therein satisfy the criteria to constitute admissible evidence.

### b.  Method of Presentation

Most of the government's video and documentary evidence will be presented through the testimony of eyewitnesses. The government's body worn camera evidence will be presented through the testimony of responding PGCPD and MPD officers, and other possible eyewitnesses. The video obtained from the civilian witness's cell phone camera will be also be presented through the testimony of law enforcement and civilian eyewitnesses.   The government will seek to admit

the defendant's two falsified PC Statements; one that is related to the charged offenses, and another related to one of the Rule 404(b) incidents (if permitted by the Court). *See* Fed.R.Evid. 801(d)(2)(A); *see also United States v. Sutton*, 2023 WL 8472628, at *34-36 (D.D.C. Dec. 6, 2023) (admitting evidence of the defendants' false statements in a Section 1512(b) prosecution).

### c.  Rule 404(b) Evidence

The government's motion in limine to admit Rule 404(b) evidence of other acts has been provisionally admitted by this Court, subject to the Court's FRE 403 analysis during trial. *See* ECF Nos. 63, 64. As outlined in the government's motion, the defendant's termination history from one prior police department is admissible under Rule 404(b) to prove the defendant's intent, knowledge, lack of accident, or absence of mistake to commit the charged offenses. Moreover, the defendant on at least one prior occasion similarly used excessive force by pepper spraying a handcuffed arrestee, which the government maintains is also admissible to prove intent, knowledge, lack of accident, or absence of mistake. If permitted, the government's Rule 404(b) evidence presentation will be consistent with the summaries outlined in its motion (*See* ECF No. 32).

### d.  Expert Evidence

The parties have provided reciprocal notice of its intent to introduce expert testimony at trial. The parties have further submitted competing motions in limine to restrict or narrow the expert evidence so that it complies with FRE 702, 703, and 704. *See* ECF Nos. 43, 48, 49, 51, 56, 61, 69, 71.

The government expects that its expert, Sergeant William Gleason (Sgt. Gleason) of the PGCPD will testify as both a fact and expert witness. As a fact witness, Sgt. Gleason will testify

about the police training that all Maryland Police Officers receive – including the defendant – in the course of becoming a state certified police officer, and through mandated in-service training. Sgt. Gleason will also offer expert opinions about the defendant's conduct in this case, and that it was inconsistent with his training and FHPD policies.

The government has moved in limine to preclude the defendant's expert – Mr. Trevor Hewick – from offering expert opinions that improperly relay inadmissible evidence.   The defendant has indicated that he expects Mr. Hewick's testimony to comport with the Rules of Evidence.   *See* ECF No. 68.

### e.  Jurisdiction

In various pleadings, defense counsel has indicated that he believes jurisdiction is lacking as to the obstruction of justice count (Count Two) because the PC Statement was authored in Maryland.   The government anticipates that the defendant will improperly argue at trial that the obstruction of justice offense charged in Count Two has a jurisdictional element that the government is required to prove beyond a reasonable doubt.   *See* ECF No. 65 at 71, and 77 n. 10. However, the obstruction of justice offense was properly charged in the District of Columbia because the defendant engaged in misleading conduct to cover-up his use of excessive force in the District.   *See* 18 U.S.C. § 1512(i) ("A prosecution under this section . . . may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected . . . ."); *see also United States v. Ring*, 628 F.Supp.2d 195, 222 (D.D.C. 2009) ("Congress expressly intended [Section 1512(b)(3)] would apply to 'activities designed to create witnesses as part of a cover-up and to *use unwitting third parties or entities* to deflect the efforts of law enforcement agents in discovering the truth.'") (emphasis in original).   Accordingly,

the defendant should be precluded from making such arguments at trial.

### f. Defense Witnesses

On its witness list, the defendant included several individuals the government also listed on its witness list, including Sinclair, Seat Pleasant Police Corporal Marcellus Loving (FRE 404(b) witness), and FBI Special Agent Mike Miller. Although the government does have these individuals under subpoena, at this point in trial preparation, the government does not anticipate calling these witnesses.

For each of these witnesses, and in particular Sinclair and Loving, the defendant should not be permitted to call the witnesses for the sole purpose of impeaching them or encouraging jury nullification. *See, e.g., United States v. Libby*, 475 F.Supp.2d 73, 80 (D.D.C. 2007) ("[i]mpeachment evidence . . . may not be employed as a mere subterfuge to get before the jury evidence not otherwise admissible") (internal quotations and citations omitted); *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984) (holding that it would be an abuse of FRE 607 to impeach a witness, including by a party calling that witness, "where employed as a mere subterfuge to get before the jury evidence not otherwise admissible.") (citations omitted).

Nor should the defense be permitted to discuss in its opening statement information that would only come into evidence through impeaching these witnesses, since the government does not intend to call them.

### III. Conclusion

The defendant must be held accountable for his unlawful use of force against a restrained arrestee, and for the defendant's subsequent obstruction of justice to cover up his misconduct. The government's evidence will prove the defendant's guilt beyond a reasonable doubt.

Respectfully submitted,

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
4 Constitution Square
150 M St. NE, 7.121
Washington, D.C. 20530
Email: Sanjay.Patel@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ Christopher R. Howland*
CHRISTOPHER R. HOWLAND
D.C. Bar No. 1016866
Assistant United States Attorney
601 D Street, NW
Washington, DC 20001
Email: Christopher.Howland@usdoj.gov

20

## <u>CERTIFICATE OF SERVICE</u>

SANJAY H. PATEL, attorney for the United States, hereby certifies that a true and correct copy of the government's trial brief has been electronically filed and accordingly served upon attorney for the defendant.

DATED: May 24, 2024      */s/ Sanjay H. Patel*
            Sanjay H. Patel