UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PHILIP DUPREE,<br>    Defendant. | Criminal Action No. 22-275 (CKK) |

**MEMORANDUM OPINION**
(March 13, 2025)

A jury convicted Defendant Philip Dupree of willfully violating Torrence Sinclair's civil rights under color of law.  Now before the Court is Dupree's motion for a judgment of acquittal.  For the reasons that follow, the Court shall **DENY** Dupree's motion and affirm the jury's verdict.[1]

## I. BACKGROUND

A grand jury indicted Dupree on two charges.  Count One charged Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242.  Indictment, ECF No. 1 at 2.  And Count Two charged Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(3).  *Id.* at 2–3.  Both charges related to Dupree's conduct in his capacity as an officer of the Fairmount Heights Police Department (FHPD) in the early morning hours of August 4, 2019.

Fairmount Heights is a small town in Prince George's County, Maryland.  Its southwestern border is the eastern sidewalk of Eastern Avenue NE.  Eastern Avenue itself is in the District of Columbia.  These geographic technicalities were a point of confusion on August 4.

At around 1:00 AM, Officer Dupree—patrolling in an unmarked Ford—initiated a traffic stop on a white Chrysler he perceived to be speeding southwest on Sheriff Road near Addison

---

[1] In resolving Dupree's motion, the Court focused its consideration on: Dupree's Supplement to Oral Motion for Judgment of Acquittal, ECF No. 98 ("Mot."); the Government's Memorandum in Opposition, ECF No. 99 ("Opp'n"); and Dupree's Reply, ECF No. 100 ("Reply").

1

Road in Fairmount Heights. Mr. Torrence Sinclair was driving the Chrysler with his sister Ms. Taylor Sinclair in the passenger seat. Instead of stopping on Sheriff Road, Mr. Sinclair continued southwest toward Eastern Avenue. He then turned right onto Eastern Avenue and parked his car near Booth Lane—about half a mile from where Officer Dupree initiated the stop.

Officer Dupree approached the Chrysler, handcuffed Mr. Sinclair, and called for backup. Corporal Jason Buie of the Prince George's County Police Department (PGCPD) was then dispatched to the scene. Although PGCPD and FHPD are distinct departments, PGCPD officers often reinforce smaller departments within their jurisdiction as a matter of course.

Meanwhile, the Sinclairs called for backup of their own. During the initial traffic stop, the two Sinclairs were on the phone with their mother. When she heard that her children had been pulled over, she raced to the scene and began filming. After the stop, but before the Sinclairs' mother arrived, Taylor Sinclair called 911. During the call, Ms. Sinclair said that she felt unsafe because Officer Dupree had approached the car with his can of pepper spray drawn and said: "Put your hands behind your back or I'm gonna turn this body camera on and make it a legitimate arrest." (Officer Dupree did not, in the end, turn his body camera on.) Ms. Sinclair requested that a D.C. police officer be sent to Eastern Avenue. And Officer Lancelot Francioni of the Metropolitan Police Department (MPD) was dispatched to the scene.

By the time Officer Francioni—who was wearing a bodycam—arrived on Eastern Avenue, the situation was chaotic. Four cars were parked in a row on the shoulder: First, Mr. Sinclair's Chrysler, then Officer Dupree's Ford, then Corporal Buie's PGCPD squad car, and finally Officer Francioni's MPD cruiser. As a tow truck pulled to the front of the queue, the Sinclairs' mother began screaming at Taylor Sinclair to get back in her brother's Chrysler to prevent it from being towed. When Ms. Sinclair did so, Officers Dupree and Francioni directed her to exit the Chrysler.

2

But Ms. Sinclair began screaming that she would not interact with male officers. Officer Dupree drew and began shaking his can of pepper spray while Officer Francioni tried to establish a rapport with Ms. Sinclair. When Ms. Sinclair still refused to exit the Chrysler, Officer Dupree removed her, handcuffed her, and passed her to Officer Francioni—who attempted to deescalate the situation by calmly asking her questions.

While Officers Dupree and Francioni dealt with Ms. Sinclair, Mr. Sinclair was sitting handcuffed in the front passenger seat of Officer Dupree's Ford.[2] Mr. Sinclair was screaming obscenities and writhing in his cuffs. Either intentionally or by accident (accounts differ), he activated the lights and sirens in Officer Dupree's Ford. And Corporal Buie, who was standing nearby, opened the door and tried to calm Mr. Sinclair down. Later, when Mr. Sinclair became even more agitated and threatened "to switch this car outta gear and make this bitch roll down the motherfucking street," Corporal Buie removed Mr. Sinclair from the Ford.

As these events played out, Officer Dupree was contacting his superiors. He and Officer Francioni thought they were in Maryland, wrongly believing that the D.C.-Maryland border ran down the center line of Eastern Avenue. Corporal Buie and the Sinclairs all knew they were in D.C. But Officer Dupree initiated the stop, so he was in charge of the scene. And his jurisdictional confusion frustrated his efforts to arrange a transport for the Sinclairs.

Throughout the ensuing period of delay, Mr. Sinclair was—in Corporal Buie's words—"acting a fool." Standing handcuffed against Officer Dupree's car, and later seated on the curb, Mr. Sinclair screamed, danced, sang, cracked wise, and generally behaved in a disruptive manner. Mostly though, he mocked and verbally antagonized Officer Dupree. Mr. Sinclair called Officer

---

[2] Readers might find it odd that Officer Dupree placed a detainee in the *front* seat of his police car. They would not be alone. Officer Francioni, for example, later testified: "I just would never put someone in the front seat." Trial Tr. Vol. II, ECF No. 93 at 176:5. The wisdom of that approach will become obvious.

3

Dupree every name under the sun. He threatened to sue and ruin Officer Dupree's career. And he demanded repeatedly that anyone other than Officer Dupree be responsible for his transport.

Eventually, Officer Dupree grabbed Mr. Sinclair and placed him back in the front seat of his car. Officer Dupree then stood next to Mr. Sinclair with the passenger door open while Mr. Sinclair—whose hands were still cuffed behind his back—screamed: "I don't want to go with him! Can y'all let somebody else take me?" According to Officer Dupree, at some point amidst the screaming, Mr. Sinclair attempted to bite him. Neither Officer Francioni's bodycam nor the Sinclair's mother's phone captured video of such an attempt. But Officer Dupree asked: "Did you just --?" Then he stepped back from the passenger door, shook up his can of pepper spray, moved forward, and deployed a burst into Mr. Sinclair's face and neck from a few inches away.

Ms. Sinclair began screaming. Mr. Sinclair wailed in pain and demanded an ambulance. But when the ambulance arrived about ten minutes later, Mr. Sinclair was so agitated that EMTs could not treat him. Officer Dupree put Mr. Sinclair back into the front seat of his car and drove him away for booking in Maryland.

\*     \*     \*

After Officer Dupree's indictment and motions practice, this matter proceeded to a jury trial. The Government presented its case-in-chief over four days. At the close of the Government's evidence, Officer Dupree moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The Court reserved decision on that motion under Rule 29(b). Then Officer Dupree presented his defense, and the case was submitted to the jury. The jury convicted Officer Dupree on Count One, Deprivation of Rights Under Color of Law, but acquitted him of Count Two, Obstruction of Justice. Officer Dupree then filed a renewed motion for a judgement of acquittal on Count One under Rule 29(c). His motion is ripe for this Court's review.

4

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29(a) permits a defendant to move for a judgment of acquittal after the Government closes its evidence. The Court must enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When the Court reserves decision on such a motion, it must later "decide the motion on the basis of the evidence at the time the ruling was reserved"—that is, the Court must confine itself to the evidence presented in the Government's case in chief. Fed. R. Crim. P. 29(b).

A defendant may also move for a judgment of acquittal following the return of a guilty verdict. Fed. R. Crim. P. 29(c). In this posture, the Court considers the Government's case-in-chief and the defense case.[3] The Court "owe[s] tremendous deference to a jury verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). As such, the Court "must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).

The Court's fundamental task is identical in either posture. *See* 2A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 467 (4th ed. 2024) (noting the standard "is the same regardless" of timing). Considering the evidence in the light most favorable to the Government, the Court must deny a Rule 29 motion if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

---

[3] At least, Officer Dupree suggests as much. *See* Mot. at 6. He cites no authority for this proposition, and the Government does not address it. Some out-of-circuit precedent suggests Officer Dupree is correct. *E.g.*, *United States v. Hunt*, 573 F. Supp. 3d 779, 792 (E.D.N.Y. 2021). And his interpretation accords with Rule 29's structure. But the "uncertainty is of no moment": Officer Dupree's Motion fails regardless of whether the Court considers evidence presented in the defense case. *United States v. Green*, 735 F. Supp. 3d 8, 19 n.2 (D.D.C. 2024) (RDM). For that reason, the Court assumes without deciding that Officer Dupree is correct and does not address the issue further.

## III. ANALYSIS

Officer Dupree argues that the Government presented insufficient evidence to secure his conviction for Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242. The parties agree that, to prove a violation of Section 242, the Government was required to produce evidence that: (1) Officer Dupree acted under color of law; (2) Officer Dupree deprived Mr. Sinclair of a constitutional right; (3) Officer Dupree acted willfully; and (4) the offense resulted in bodily injury to Mr. Sinclair. *See* Mot. at 8; Opp'n at 3.

Officer Dupree does not dispute that he acted under color of law. But he argues that the Government failed to establish each of the other three elements of the offense. For the reasons that follow, the Court disagrees and will deny his motion for a judgment of acquittal.

### A. Unreasonable Force

The Government adduced sufficient evidence for a reasonable jury to conclude that Officer Dupree deprived Mr. Sinclair of his Fourth Amendment right to be free from unreasonable searches and seizures by using unreasonable force against him.

The parties agree on the relevant standards as instructed by the Court. *See* Mot. at 12; Opp'n at 4. "Unreasonable force is force that exceeds the objective need to use such force." Jury Instruction 27. To determine whether Officer Dupree's use of force was objectively reasonable, the jury was instructed to consider "all the facts and circumstances" from "the point of view of an ordinary and reasonable police officer . . . on the scene and at the moment" the force was used. *Id.* The Court further instructed that the jury should consider:

> (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the alleged victim's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the alleged victim was actively resisting.

*Id.*; *see also Kingsley v. Henderson*, 576 U.S. 389, 397 (2015) (listing these factors).

6

The Government's evidence was sufficient under this totality-of-the-circumstances framework. Nearly all of Officer Dupree's encounter with Mr. Sinclair was preserved in videos presented to the jury. Officer Francioni's bodycam footage showed the scene from the front of Officer's Dupree car. *See* Gov't's Ex. 101. And Mr. Sinclair's mother filmed the scene from behind on her iPhone. *See* Gov't's Ex. 100. That video evidence showed that Mr. Sinclair was under the physical control of Officer Dupree and Corporal Buie for more than twenty minutes before Officer Dupree deployed his pepper spray. The videos showed that when Officer Dupree deployed his spray, Mr. Sinclair was handcuffed with his hands behind his back in Officer Dupree's car. And though the videos do not clearly capture the moment when Officer Dupree claims Mr. Sinclair tried to bite him, they do show Officer Dupree taking four seconds to react, step back from Mr. Sinclair, draw his pepper spray, shake the canister, then close the distance from Mr. Sinclair to deploy the spray directly into his face and neck from inches away.

The jury also heard extensive witness testimony regarding the incident. Corporal Buie and Officer Francioni testified repeatedly that, although Mr. Sinclair was being obnoxious and verbally abusive, he was not attempting to flee, presented no physical threat, and was safely restrained when Officer Dupree deployed his pepper spray. *See, e.g.*, Trial Tr. Vol. I, ECF No. 92 at 98:2–9 (Corporal Buie); Trial Tr. Vol. II at 179:5–17 (Officer Francioni). Corporal Buie testified to his reaction to Officer Dupree's use of force: "Just baffled, disbelief, surprise." Trial Tr. Vol. I at 142:21. And Officer Francioni testified that: "You don't pepper-spray anyone that's handcuffed plain and simple. You just don't do that." Trial Tr. Vol. II 242:18–19. In short, two police officers who witnessed the events firsthand testified that they saw no need to deploy pepper spray against Mr. Sinclair and would not have done so themselves.

Officer Dupree offers three arguments that this evidence was insufficient. None persuades.

7

*First*, Officer Dupree faults the Government for presenting evidence of departmental policies and his training rather than of a "national standard for use of force." Reply at 3. But as the Court instructed the jury, evidence about departmental policy and Officer Dupree's training was relevant to determining the *willfulness* of his violation, not the fact of it. *See* Jury Instruction 30 ("[Y]ou should consider that evidence only in determining whether the defendant acted willfully; you should not consider that evidence in determining whether the defendant's actions violated the Constitution in the first instance."). And the Government was not required to prove the content of any "national" use-of-force standard because the Court provided the relevant standard to the jury in an instruction Officer Dupree does not contest. *See* Jury Instruction 27.

*Second*, Officer Dupree offers a few affirmative arguments that his use of force was reasonable. He contends that the video evidence showed that Mr. Sinclair was close enough to bite him. *See* Mot. at 13–14.[4] And he argues that Mr. Sinclair's activation of the sirens and threat to put Officer Dupree's car in gear meant he was actively resisting arrest. *Id.* at 13.

But a rational jury could still have found Officer Dupree's use of force was unreasonable given the evidence in the Government's case-in-chief. For instance, Mr. Sinclair said he would put the car in gear more than seven minutes before Officer Dupree deployed his pepper spray. *See* Gov't's Ex. 101. Officer Francioni testified, consistent with the videos, that Officer Dupree had no discernible reaction to Mr. Sinclair's statement. Trial Tr. Vol. II at 167:3–6. In fact, Corporal Buie was the only person who responded. And he did so by calmly extracting Mr. Sinclair from the car—not by pepper-spraying a handcuffed detainee in the face. Trial Tr. Vol. I at 110:4–22.

---

[4] To be precise, Officer Dupree argues that his expert witness testified that the video showed this. Mot. at 15. But evidence presented in the defense case is irrelevant to Officer Dupree's reserved Rule 29(a) motion. And to the extent his expert's testimony about observable facts in an item of video evidence is relevant to his renewed motion under Rule 29(c), Officer Dupree admits that the Government's expert testified to the contrary. *Id.* It is the province of the jury, not the Court, to weigh and credit that competing testimony. *See Campbell*, 702 F.2d at 264.

In any event, these arguments fundamentally misconceive the nature of a Rule 29 motion. Officer Dupree must show that, taking the evidence in the light most favorable to the Government, no reasonable jury could have found his force excessive. *See Wahl*, 290 F.3d at 375. Instead, he argues that the jury should have looked at the evidence in a light more favorable to him and drawn inferences in his favor. That line of reasoning does not entitle him to a judgment of acquittal.

*Third*, and finally, Officer Dupree points to "weaknesses in the Government's evidence." Mot. at 16. He argues the Government's video exhibits were unclear; he asserts that Corporal Buie and Officer Francioni did not have unobstructed views of Mr. Sinclair; and he notes that the Government's witnesses made statements inconsistent with their trial testimony to the FBI and to the grand jury. *Id.* at 16–18. But the jury heard Officer Dupree's counsel develop these arguments on cross-examination. *E.g.*, Trial Tr. Vol. II at 17:12–19:16, 198:7–200:4. And his arguments all go to the weight of the evidence, not its legal sufficiency. For that reason, they are inapposite to his Rule 29 motion. Wright & Miller, *supra,* § 467 ("It is not for the court to assess the credibility of witnesses, weigh the evidence, or draw inferences of fact from the evidence.").

In sum, the evidence presented at trial was sufficient for a rational jury to conclude that it was objectively unreasonable for Officer Dupree to pepper-spray Mr. Sinclair in the face while he sat in a car with his hands cuffed behind his back.

### B. Willfulness

Next, Officer Dupree argues the evidence adduced at trial was insufficient to prove that his unreasonable use of force was willful. Mot. at 18–21. The parties agree that the Court properly instructed the jury of the Government's burden on this element. Mot. at 18; Opp'n at 9. The Court instructed that Officer Dupree's conduct was willful only if "the defendant used force knowing that the force he used was unreasonable." Jury Instruction 28. Although the Government did not need "to prove that the defendant knew that this action would actually violate anyone's

9

constitutional rights," it did need to prove "that the defendant intended to use more force than was reasonable under the circumstances." *Id.*

Because Section 242 requires specific intent to act unlawfully, it also requires acquittal if Officer Dupree subjectively, but mistakenly believed his use of force was reasonable. In this way, Section 242's willfulness *mens rea* functions similarly to the qualified immunity police officers enjoy against suits under 42 U.S.C. § 1983. *See United States v. Sutton*, 636 F. Supp. 3d 179, 194 (D.D.C. 2022) (PLF); *see also United States v. Lanier*, 520 U.S. 259, 270 (1990). Nonetheless, the evidence adduced at trial was sufficient for a rational jury to conclude that Officer Dupree knew he was using, and intended to use, unreasonable force when he pepper-sprayed Mr. Sinclair.

Officer Dupree challenges the sufficiency of the evidence of his mental state. As the U.S. Court of Appeals for the D.C. Circuit has recognized, in "most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite *mens rea* through direct evidence." *United States v. Schaffer*, 183 F.3d 833, 843 (D.C. Cir. 1999), *vacated as moot*, 240 F.3d 35 (D.C. Cir. 2001). For that reason, "proof must be inferred from circumstantial evidence instead." *United States v. Vega*, 826 F.3d 514, 523 (D.C. Cir. 2016) (per curiam).

Here, the Government offered sufficient circumstantial evidence for a reasonable jury to infer that Officer Dupree intentionally used more force than was necessary against Mr. Sinclair, knowing that such force was excessive, in a deliberate effort to punish Mr. Sinclair for his antagonistic behavior. Four categories of evidence supported that conclusion.

*First*, the Government introduced evidence of Officer Dupree's training that supported an inference that he knew what constituted an appropriate—as opposed to unlawfully excessive—use of force. The jury heard this evidence principally though the testimony of Seargeant William Gleason of the PGCPD. Seargeant Gleason is a police instructor and use-of-force expert certified

by the Maryland Police and Correctional Training Commission, which issues standardized training objectives for all Maryland police academies. *See* Trial Tr. Vol. III, ECF No. 94 at 106:15–117:8.

At trial, Seargeant Gleason reviewed records of Officer Dupree's initial training at the Anne Arundel Community College Police Academy (Gov't's Ex. 403) and later in-service training (Gov't's Ex. 404). *See* Trial Tr. Vol. III at 117:9–135:11. As Seargeant Gleason testified, and as corroborated by Officer Dupree's records, Officer Dupree: was trained on the difference between reasonable and unreasonable force, *id.* at 134:20; was trained to deploy pepper spray from four to six feet away and only against "active" resistors or aggressors, *id.* at 140:8; was trained that it is generally improper to pepper-spray someone in handcuffs, *id.* at 146:21; and was trained that "it's a violation of somebody's civil rights if you use force as punishment," *id.* at 147:15. Officer Dupree's records further showed that he was specifically trained that an officer could be subject to criminal prosecution for "misuse of his/her weapon." Gov't's Ex. 403 at 23. A rational jury could have concluded from this evidence that Officer Dupree—like all Maryland police officers—knew what constituted an unlawful use of force.

*Second*, the Government introduced evidence of Officer Dupree's employment history that supported an inference that he had actual notice of what constituted an improper use of force and of the consequences that could follow from an unlawful use of force. For example, Officer Dupree's training records showed that he had received "remedial training" at the police academy for being "[t]oo aggressive" during a "Suspicious Suspects" exercise. Gov't's Ex. 403 at 6.

The jury also heard testimony from Elliott Gibson, the former Chief of Police of the District Heights Police Department (DHPD), where Officer Dupree was previously employed. Trial Tr. Vol. IV, ECF No. 95 at 120:9. Chief Gibson testified that he suspended Officer Dupree due to the "unprecedented [and] alarming" number of complaints lodged against Officer Dupree during his

11

time as a probationary officer. *Id.* at 126:22–127:3. Two of those complaints were for "Use of Force." Gov't's Ex. 406. Chief Gibson further testified that, in response to these complaints, he arranged for Officer Dupree to receive additional on-the-job training from model officers and that he spoke with Officer Dupree "about the show of force" and about the "use of force continuum." Trial Tr. Vol. IV at 136:9–137:25. But in the end, Chief Gibson concluded that "[c]areful documentation, counseling, and retraining" failed to resolve his concerns about Officer Dupree. Gov't's Ex. 407. And Chief Gibson terminated Officer Dupree's employment at DHPD. *Id.*

From this evidence, a rational jury could have concluded that Officer Dupree had uniquely personal knowledge about what constitutes unreasonable force and about the consequences of using unreasonable force.

*Third*, witness testimony and video evidence of Officer Dupree's conduct supported an inference that he grew increasingly annoyed and angry with Mr. Sinclair throughout their encounter and acted with a motive to punish him. Corporal Buie testified that, as the traffic stop dragged on and as Mr. Sinclair continued to sling "derogatory" remarks at Officer Dupree, Officer Dupree became "frustrated." Trial Tr. Vol. I at 125:7–16, 132:15. He described seeing "[r]olling of the eyes [and] clenching of the teeth" in response to Mr. Sinclair's insults. *Id.* at 134:1–3. And Corporal Buie shared his opinion that Officer Dupree appeared "upset with Mr. and Mrs. Sinclair and all the comments that they said" in the moments before he deployed his pepper spray. *Id.* at 144:18–145:3. That testimony was consistent with the video evidence presented at trial.

Further, that video evidence supported the conclusion that Officer Dupree's use of force against Mr. Sinclair was deliberate rather than a "split second" reaction. *See* Reply at 10. Officer Francioni summarized the video well: "[F]rom the moment that said bite happened to when Officer Dupree stepped back, grabbed his mace, shook it up, and then stepped forward to spray [Mr.

12

Sinclair], it wasn't an instant reaction." Trial Tr. Vol. II at 248:2–5. Seargeant Gleason also offered his expert opinion on the matter:

> So [Officer Dupree] did a good job of creating distance initially, and that slowed things down. Then by the time he deployed force, it was almost four seconds later. There was clearly no threat at that point. And then he closed the distance, which obviously causes things to escalate.

Trial Tr. Vol. IV at 96:11–16. This evidence offered the jury a sufficient basis to infer that Officer Dupree had a motive to punish Mr. Sinclair and that he acted on this motive intentionally.

*Fourth*, evidence of Officer Dupree's conduct after pepper-spraying Mr. Sinclair supported an inference that he knew his conduct was unlawful. Specifically, the evidence showed that Officer Dupree misrepresented key facts about the events of August 4 in a way that tended to minimize his culpability and head-off further investigation. Despite learning that he deployed his pepper spray outside of FHPD's jurisdiction, Officer Dupree reported that he did so "near" Washington, D.C. and "in Prince George's County, Maryland." Gov't's Ex. 301 at 6–7. Officer Dupree reported that Mr. Sinclair "kick[ed] and damag[ed]" his car and "tried to jump out of the police car several times." *Id.* But Corporal Buie and Officer Francioni both testified that was not true. Trial Tr. Vol. I at 179:2–180:23; Trial Tr. Vol. II at 250:20–252:14. Officer Dupree further reported that EMTs on the scene "decontaminated" Mr. Sinclair after he had been sprayed. Gov't's Ex. 301 at 7. But one of those EMTs testified that was not true either. Trial Tr. Vol. II at 126:8–15. And Officer Dupree's reports completely omitted the fact that there were multiple witnesses to his use of force, including two police officers. *See generally* Gov't's Exs. 301, 304.

On this basis, a rational jury could have concluded that Officer Dupree knew that deploying pepper spray against a handcuffed detainee was unreasonable, knew that using unreasonable force was unlawful, and deliberately deployed that force anyway to punish Mr. Sinclair—with whom he was upset and frustrated. In short, there was sufficient evidence to prove that he acted willfully.

13

### C. Bodily Injury

Finally, Officer Dupree argues the Government's evidence was insufficient to prove that Mr. Sinclair suffered a bodily injury.[5] Mot. at 21–22. The parties do not dispute that the Court properly instructed the jury that "bodily injury" in the context of Section 242 "includes any injury to the body, no matter how minor or temporary" and further "includes any cut, abrasion, bruise, burn, fracture, illness, physical pain, or disfigurement." Jury Instruction 29; *see also* 18 U.S.C. § 831(g)(5) (articulating this definition in a different context); *United States v. Easterday*, 729 F. Supp. 3d 17, 27–28 (D.D.C. 2024) (JEB) (collecting cases that apply the Section 831(g)(5) definition to Section 242 prosecutions). Accordingly, the issue is whether a reasonable jury could have concluded from the evidence that Mr. Sinclair suffered physical pain—even temporarily— when he was pepper-sprayed in the face from inches away.

The evidence presented at trial was sufficient for a reasonable jury to reach that conclusion. The jury heard from multiple witnesses with personal knowledge of pepper spray's effect as a general matter. For example, Corporal Buie explained that he had been pepper-sprayed during his training. He did not enjoy the experience: "I'd rather get punched. It burns, a burning sensation wherever you get sprayed at. It feels like you're on fire." Trial Tr. Vol. I at 62:2–9. Likewise, Officer Francioni testified that when he was pepper-sprayed, he felt a "very bad burning sensation . . . in places that you never knew you had." Trial Tr. Vol. II at 156:8–9.

Further, the jury saw substantial video evidence of pepper spray's effect on Mr. Sinclair in particular. In the seconds after Officer Dupree deployed his pepper spray, Mr. Sinclair began screaming for someone to "call the ambulance, please." Gov't's Ex. 101 at 23:24. Minutes later,

---

[5] This final element could also have been satisfied by a finding that Officer Dupree's pepper spray was a "dangerous weapon." 18 U.S.C. § 242. Because the jury found Officer Dupree's use of force resulted in a bodily injury, it was not required to make that alternative finding. *See id.*; Jury Instruction 29.

while waiting for the ambulance to arrive, Mr. Sinclair was still screaming: "I need medical attention! This shit is burning!" *Id.* at 28:00. When the ambulance finally arrived, Mr. Sinclair further explained his sensation of physical pain: "I've had third-degree burns and it didn't feel like this. . . . It feels like I'm on fire in this fucking car!" *Id.* at 32:20–32:42.

Officer Dupree's counsel nevertheless attempted to raise a reasonable doubt as to whether Mr. Sinclair was truly in pain at trial. For example, Officer Francioni conceded on cross that Mr. Sinclair complained of physical pain before he was pepper-sprayed when officers maneuvered him in handcuffs. *See* Trial Tr. Vol. II at 232:6–234:1. And the Government's overview witness, FBI Special Agent Deborah Frye, also noted that Mr. Sinclair was photographed sleeping—rather than continuing to scream in pain—about three-and-a-half hours after Officer Dupree's use of force. *See* Trial Tr. Vol. III, at 77:9–10, 90:5–91:25.

Officer Dupree now claims that these arguments were so forceful that a reasonable jury must have concluded that Mr. Sinclair only feigned his complaints of physical pain. Reply at 11. And he further suggests that the Government's decision not to call Mr. Sinclair as a witness required the jury to engage in unsupported "speculation" as to his physical sensations. *Id.*

But these are arguments Officer Dupree could—and did—make to the jury at trial. They are not arguments that require the Court to usurp the jury's function of weighing the evidence and reaching their own conclusion as to the sincerity of Mr. Sinclair's complaints. A rational jury could rely on witness testimony and video of Mr. Sinclair's contemporaneous statements to draw the reasonable inference that Mr. Sinclair experienced physical pain when he was pepper-sprayed in the face from inches away. The jury ultimately did so here. And Officer Dupree is not entitled to a judgment of acquittal on this basis.

## IV. CONCLUSION

For the reasons stated, the Court will **DENY** Defendant Philip Dupree's [98] Motion for Judgement of Acquittal. An appropriate Order accompanies this Memorandum Opinion.

**DATED:** March 13, 2025.

                                                                                        */s/ Colleen Kollar-Kotelly*
                                                                 COLLEEN KOLLAR-KOTELLY
                                                                 United States District Judge